The opinion of the Court was afterward drawn up by
Parker C. J.
This case is somewhat complicated, and it is necessary to unravel it before we can apply the principles which ought to decide the controversy between these parties.
Before the 29th of April, 1819, Thomas Fry and Nathaniel Fry were the owners, as tenants in fee simple, of the land in question. On that day they made their joint mortgage of it to John Gould, to secure 1500 dollars due to him. An equity of redemption was then left to the two mortgagers. On the 12th of March,' 1821, Nathaniel Fry made an absolute deed of all his right to Thomas, and on the same day Thomas exe *500 outed a mortgage deed of the same premises to Nathaniel to secure the payment of 1000 dollars. In this state of the conveyances Gould was the legal owner of .the land, under the joint mortgage to him above stated, with an equity or right to redeem then subsisting wholly in Nathaniel Fry, which equity was defeasible by Thomas on performance of the condition of his deed to Nathaniel. Between the two Frys their condition was the same as would have been created by a bargain and sale of the land itself, and their respective rights were the same, the land being encumbered by the mortgage to Gould. The right of Gould was transferred to Willard by deed on the 8th of February, 1825. The right of Nathaniel Fry was transferred to Joseph and Elijah Bissel, and by them to Howard and Lathrop, who entered upon the land, by consent of Thomas Fry, in December, 1823. Gould, before his assign ment to Willard, viz. February 27, 1824, had entered upon them by virtue of his mortgage, in order to foreclose the right to redeem. His seisin under the mortgage passed to Willard, by virtue of the assignment, in February, 1825. On the 7th of January, 1824, when the sheriff’s sale took place, the title stood virtually thus : — Gould was the legal owner by virtue of the mortgage, and Howard and Lathrop were the owners of the right in equity to redeem, by virtue of the conveyance from Nathaniel Fry ; and Thomas Fry had a right to redeem this equity and restore himself to the right of paying off Gould’s mortgage and so becoming owner of the whole land. Thomas Fry’s right was then sold by the sheriff, and the plaintiff was the purchaser. What right did he acquire by the sheriff’s deed ? certainly nothing more than the right of Thomas Fry. which was to pay off the mortgage to Nathaniel, which had become vested in Howard and Lathrop, and then to pay off the mortgage to Gould, and he paid for this right only. Under this purchase, after the estate of Gould was vested in Willard, viz. on the 26th of February, 1826, the plaintiff paid to Willard the amount due on the mortgage to Gould and took from him a deed, the effect of which will be presently considered. If Thomas Fry himself, supposing his title had not been transferred, had paid the money due, it is manifest that whatever might have been the form of the deed from Willard to him, he *501 could not thereby have defeated his own mortgage to Nathaniel; and it would seem to follow, that the purchaser of Thomas’s right could not, merely by paying off the mortgage to Gould, secure to himself an indefeasible title notwithstanding Thomas’s mortgage was outstanding, the equity purchased being that of redeeming against both mortgages, for that was all the sheriff could sell.
So if the plaintiff had merely paid the amount of the mortgage to Gould, or tendered it and then proceeded to exact his right at law or by a bill in equity, the result would have been, that he would have held the land discharged of that mortgage, but as he would come to the land only under Thomas Fry, the mortgager, whose right he had purchased, he would not thereby have acquired a right to hold the land discharged of Thomas Fry’s mortgage to Nathaniel, made before the right in equity was sold.
But it is contended, that by virtue of the deed from Willard to him, he became assignee of the mortgage to Gould, so that in consequence of the entry to foreclose made by Gould in 1824, the absolute title, at the expiration of three years from the time of that entry, vested in him to the entire defeat of the tenants’ claim under the mortgage of Thomas Fry. The effect of which would be, not only to supplant those who were prior in right to him, but to acquire the value of this mortgage to himself without any consideration, for he is presumed to have paid for the right to redeem only what the land was worth over and above both mortgages. The law certainly would not work this mischief without the aid of the parties, and we think with such aid the attempt to produce this effect must be unsuccessful. Even if the deed produced was an assignment in terms, and so intended to be by the parties to it, if the second mortgage had been then the property of a third person not consenting, we much doubt whether the plaintiff, having knowledge of the existence of that mortgage, could defend himself in a court of equity against it. Indeed the transaction would probably be held fraudulent as against the rights of the second mortgagee.
But we are of opinion, that the deed of Willard will not admit of the construction insisted on by the plaintiff. Its *502 general phraseology is that of a mere quitclaim 01 release, [1] and notwithstanding it contains the words grant, bargain, sell, &c. yet these words are to be limited and restrained by the general tenor of the context, the subject matter, and more especially by the express declaration of intent by the grantor contained in the deed itself. Words importing general covenants in a deed may be restrained by subsequent words showing a manifest intent to limit and restrain them to a particular subject. It is true, that if there is a clear and undoubted grant in the former part of a deed, and afterwards words are added which are repugnant or contradictory, the latter may be rejected ; but where the words are ambiguous, or so mixed up with other words as to show an intent different from the common effect of some of the words if taken by themselves, the subsequent words may be used to ascertain the real intent of the instrument. Now it is obvious and clear from the whole of the deed taken together, that the intent of the grantor was to give only a release or discharge of the mortgage. This was what he was bound to do by law, and he was bound also, in faithfulness to those for whom he held the mortgage in trust, not to give an assignment, the effect of which would be to destroy their right under the second mortgage. Even if the paroi evidence were admissible, it would show no different intent on his part, and as to the intent of the grantee alone to acquire by virtue of this instrument more than he had a right to ask, it certainly could not prevail. But we are inclined to think that the paroi evidence of the declarations of the parties was not competent, and ought to have been rejected. The facts and circumstances then show a right in the grantee to demand a release of the mortgage, and nothing more, and the deed given ought to have a construction which will give the plaintiff all his rights without.violating the rights of the defendants.[1]
The result of our best consideration of this subject is, that the demandant must become nonsuit, and resort to his bill in *503 equity to perfect his title by extinguishing the second mortgage ; and this places him just where he could expect to stand when he purchased the. equity of redemption at the sheriff’s sale.[2]

 See Wade v. Howard, 8 Pick. 353.

 As to the force and operation of a deed of quitclaim and release, see Somes v. Skinner, 3 Pick. (2nd ed.) 58, note 1; Revised Stat. c. 59, § 5 Wade v. Howard, 11 Pick. 296; Carll v. Butman, 7 Greenl. 102; Dockray v Noble, 8 Greenl. 278.

 See Wade v. Howard, 11 Pick. 295.